**SO ORDERED.**

**SIGNED this 20 day of March, 2008.**

_____
**J. Rich Leonard**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

**IN RE:**

| | |
|---|---|
| **PARTITIONS PLUS OF WILMINGTON, INC.,** | **Case No. 04-06776-8-JRL** |
| **D/B/A PARTITIONS, INC., D/B/A STORM** | **Chapter 7** |
| **PROTECTION SYSTEMS,** | |

**Debtor.**

| | |
|---|---|
| **JAMES B. ANGELL, CHAPTER 7 TRUSTEE** | |
| **FOR PARTITIONS PLUS OF WILMINGTON, INC.,** | |
| **D/B/A PARTITIONS, INC., D/B/A STORM** | **Adversary Proceeding No.** |
| **PROTECTION SYSTEMS,** | **L-06-00148-8-AP** |

**Plaintiff,**

**v.**

**RAY J. PENNINGTON, INC. and RAY J. PENNINGTON,**

**Defendant.**

_____

## <u>ORDER</u>

This case is before the court on the complaint of James B. Angell, chapter 7 trustee for

Partitions Plus of Wilmington, Inc., against Ray J. Pennington, Inc. and Ray J. Pennington

("Defendant") to avoid certain preferential transfers and to recover such transfers for the benefit of

the estate.  On February 27, 2008, a trial was held in Raleigh, North Carolina.

## FACTS AND BACKGROUND

Partitions Plus of Wilmington, Inc. filed a chapter 11 bankruptcy petition on September 1, 2004.  The case was converted to one under chapter 7 on November 9, 2004.  Prior to the debtor's bankruptcy filing, Defendant worked as a sub-subcontractor for the debtor on several jobs. Within ninety days prior to the debtor's bankruptcy filing, Defendant received three checks from the debtor totaling $7,305.48.

On July 14, 2006, the trustee filed this adversary proceeding, and an amended complaint was later filed on August 23, 2006.  The amended complaint alleges that the three payments to Defendant constitute preferential transfers.  Defendant answered by asserting, *inter alia*, that the payments could not be avoided because they were a contemporaneous exchange for new value given to the debtor under 11 U.S.C. § 547(c)(1).  Both parties filed summary judgment motions.  The court's order resolving these motions concluded that the three payments were preferential transfers under § 547(b).  Angell v. Ray J. Pennington Inc. et al. (In re Partitions Plus, Inc.), Adv. Pro. 06-00148-8-AP (Bankr. E.D.N.C. June 11, 2007).  In addressing Defendant's new value defense for payments arising out of projects involving government-required payment bonds and surety bonds,[1] the court held that Defendant did not establish a new value defense at that time, but that it could later do so

---

[1]Defendant previously established that the three preferential payments were made on account of work performed on projects that were divisible into three categories: (1) government projects with government-required payment bonds; (2) public projects with surety bonds; and (3) materialman's lien rights projects.  For payments resulting from projects involving materialman's lien rights, the court held that Defendant could not establish a valid new value defense because it had no lien rights with respect to the property of the debtor pursuant to Precision Walls, Inc. v. Crampton, 196 B.R. 299 (E.D.N.C. 1996), since it never perfected its lien and gave up nothing by accepting payment.

by presenting sufficient evidence that (1) it would have timely filed a claim against the project bond had it not received payment from the debtor, and (2) at the time, the debtor was still owed funds by the general contractor on which the bonding company could have asserted a lien.  Id.

Both parties again filed cross-motions for summary judgment addressing this issue.  In support of its claim that it would have filed a bond claim had it not received the preferential payment, Defendant presented evidence that (1) it filed a bond claim in the only other instance in which the debtor did not tender payment to the Defendant, and (2) the bonding company paid this claim in full.  The trustee contended that this evidence was too speculative to establish as a matter of law that Defendant would have filed a timely bond claim in these other instances.  The court ruled that Defendant's evidence was sufficiently corroborative of its likely conduct to create a genuine issue of material fact, but that it was insufficient to sustain its defense as a matter of law.  Angell v. Ray J. Pennington Inc. et al. (In re Partitions Plus, Inc.), Adv. Pro. 06-00148-8-AP (Bankr. E.D.N.C. December 3, 2007).

## ANALYSIS

### I. New Value Defense – Background

The Bankruptcy Code provides that a trustee may avoid a pre-petition transfer of a debtor's property, if it is shown that the transfer was:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made . . . on or within the 90 days before the date of the filing of the petition . . .; and
> (4) that enables such creditor to receive more than such creditor would receive if
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the

3

provisions of this title.

11 U.S.C. § 547(b).  The legislative history of the preference statute reveals its two-fold purpose:

> First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before the bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy.  The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation of all his creditors.  Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.  Any creditor that received greater payment than others of his class is required to disgorge so that all may share equally.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 177-78, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6138.

Certain transfers that would otherwise qualify as preferential transfers are often made for purposes that do not frustrate § 547(b)'s goals, and the Code exempts these transfers from the trustee's avoidance power.  <u>See</u> § 547(c)(1)-(5).  This case is concerned solely with the "contemporaneous exchange of new value" defense under § 547(c)(1).  According to § 547(c)(1), a trustee may not avoid a preferential transfer "to the extent that such transfer was (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."  As used § 547(c)(1), "new value" is defined as

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2).  The primary justification for the new value exception is that the transfer of new value to the debtor will offset the payment and, therefore, the bankruptcy estate will not be depleted to the detriment of other creditors.  1 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 6-

25, at 592 (1st Cir. 1992).

## II.  The "Indirect Transfer" Theory

The new value defense is frequently raised in cases in which a general contractor has filed for bankruptcy relief.  In this context, subcontractors who received alleged preference payments defend the preference suit by invoking a specific theory of the new value defense – the "indirect transfer" theory.[2]  In its purest form, the "indirect transfer" theory is premised on the following assumption:  had a debtor general contractor not paid a subcontractor for work performed on a project secured by a payment bond, the subcontractor would have filed a bond claim.  The bonding company, who would be forced to pay the subcontractor, would then seek indemnification from the owner for funds owed to the debtor general contractor.  In re J.A. Jones, Inc. 361 B.R. at 102.  The crux of the "indirect transfer theory" is that the debtor general contractor's estate is not diminished to any greater degree by the preferential payment to the subcontractor than it would have been had the subcontractor enforced its right to collect on the project bond and prevented the funds from ever reaching the debtor's estate.

## A. Prima Facie Case

In order to establish a valid new value defense using an "indirect transfer" theory in a case involving a subcontractor, a defendant must show that (1) it would have timely filed a claim against the project's payment bond and been paid in full had it not received payment from the debtor, and (2) at the time, the debtor was still owed funds by the general contractor on which the bonding

---

[2]In re J.A. Jones, Inc., 361 B.R. 94 (Bankr. W.D.N.C. 2007) summarized the "indirect transfer" theory in the context of the release of a subcontractor's lien rights as new value. Although this case involves the release of a subcontractor's bond claim as opposed to lien rights, the "indirect transfer" theory is equally applicable.  See Angell v. Ray J. Pennington Inc. et al. (In re Partitions Plus, Inc.), Adv. Pro. 06-00148-8-AP (Bankr. E.D.N.C. June 11, 2007).

company could have asserted a lien.

B. First Element: Filing of a Bond Claim and Payment in Full

Although this framework is seemingly straightforward, application of the first element can be particularly difficult because proving that a subcontractor would have timely filed a bond claim and been paid in full by the bonding company requires a degree of speculation since a subcontractor can only hypothesize as to what actions it would have taken. In re J.A. Jones, Inc., 361 B.R. 94 (Bankr. W.D.N.C. 2007) attempted to remove the uncertainty of this speculation in the context of a release of lien rights by adopting an objective approach that asks "what would a reasonable materialman have done in response to that nonpayment." Id. at 103. With little difficulty, the court concluded that a "reasonable subcontractor would assert his legal rights, liening the project, perfecting those liens and forcing payment through the owner." Id.

The court finds this objective approach problematic for two reasons. First, it relieves the subcontractor of the burden of proving a necessary element of its defense. A party asserting a new value defense has the burden of proving each element. 11 U.S.C. § 547(g). However, assuming, as the objective approach does, that a reasonable subcontractor would file a timely bond claim effectively eliminates the subcontractor's burden of proof regarding this issue.

The second and perhaps most troubling problem with the objective approach is that it is not always entirely clear how a reasonable subcontractor would react to nonpayment. Subcontractors that have appeared before this court have stated that they do not always file timely claims when faced with nonpayment. Their primary justification is that they do not want a reputation of being unyieldingly harsh in their business dealings. These subcontractors assert that it is difficult, especially in competitive markets, to maintain good business relationships with general contractors

if the general contractor fears that the subcontractor will file a bond or lien claim based on the slightest delinquency in payment. For these reasons, the court finds the objective approach unworkable.

A subjective approach, on the other hand, remedies both problems of the objective approach. First, it remains consistent with § 547(g) by keeping the burden of proving each element of the new value defense on the subcontractor. Second, it eliminates the objective approach's assumption that reasonable subcontractors would always file a bond claim and replaces it with a requirement of competent proof of the subcontractor's intention. The subjective approach, admittedly, requires some amount of speculation. Given the proper evidentiary showing, however, a subcontractor can sufficiently negate speculation with respect to the actions it would have taken to meet its burden of proof.

The question remains: just how much evidence is necessary to make this showing? The evidentiary requirement differs depending on the stage of the litigation. In the summary judgment context, a subcontractor must present evidence beyond its own unsupported assertion that it would have filed a bond claim. See Callaway v. Kiddco, Inc. (In re Jacobsen Constr., Inc.), Adv. Pro. S-06-00028-5-AP (Bankr. E.D.N.C. March 26, 2007). For example, a subcontractor could show that it filed bond claims in the only other instances in which the debtor did not tender payment to the defendant. Angell v. Ray J. Pennington Inc. et al. (In re Partitions Plus, Inc.), Adv. Pro. 06-00148-8-AP (Bankr. E.D.N.C. December 3, 2007). Practice in the industry, or conduct with regard to other general contractors, may be relevant.

The proof requirement obviously increases as the litigation progresses to trial. Although there is no controlling authority listing the quantum of evidence necessary to make this showing, the

court finds that Defendant's cumulative evidence in this case is sufficient to establish that it would
have filed a bond claim had it not been paid. First, Robert L. Pennington, one of Defendant's two
employees, testified that it is Defendant's general practice of over twenty years to file bond claims
if faced with nonpayment. In fact, Pennington testified that Defendant collects in full on 98% of all
overdue invoices, and that the only invoices for which it does not collect in full are those in which
it credits the general contractor for a specific reason. This testimony seems to imply that Defendant
collects, by some method, on 100% of all overdue invoices. Additionally, as noted in a previous
order, Defendant filed a bond claim and was paid in full in the only instance of nonpayment by this
debtor. That Defendant took action consistent with its stated intentions is indicative that it likely
would have taken the same course of action had it earlier been faced with nonpayment.[3] Finally,
Pennington testified at trial that he personally addresses all overdue invoices in a manner the
protects Defendant's right to timely file liens or bond claims. Pennington testified that it is his
policy to address all invoices that are overdue by at least ninety days in order to keep track of the
invoice in case it becomes necessary to file a lien or bond claim by the 120th day, the last day in
which such lien or bond claims are often permitted. This policy only adds further support to
Defendant's claim. While no single piece of Defendant's evidence would have been sufficient, by
itself, to carry the burden of establishing the new value defense, Defendant's evidence, taken as a
whole, amply supports its contention that it would have filed a bond claim had it not been paid.

That Defendant has convinced the court that it would have filed a bond claim had it not

---

[3]The court is well aware that future subcontractors attempting to establish a similar new
value defense may not have faced the necessity of filing a previous bond claim. In no way does
the court's opinion today establish the requirement that a subcontractor have filed a bond claim.
Instead, this particular fact is used only in conjunction with the other facts in order to most
accurately predict how Defendant would have reacted.

received the preferential payments does not fully resolve the issue, however. Defendant must further show that its bond claim would have been paid in full. In this case, Defendant submitted evidence that it was, in fact, paid in full for a subsequent bond claim in this project. In light of the trustee's lack of contradictory evidence, this court has no reason to believe that a solvent bonding company that later paid a bond claim in full would have been unable or unwilling to pay a prior bond claim in full as well. Based on the foregoing evidence, the court concludes that Defendant has established that it would have filed a bond claim had it not received the preferential payments, and that the bonding company would have paid the bond claim in full.

C. Second Element: Money Available for Bonding Company To Assert Lien

The second element of the "indirect transfer" theory is that the subcontractor must prove that the debtor general contractor was still owed money on which the bonding company could have asserted a lien. Without this evidence, the "indirect transfer" theory fails because the subcontractor's release of its bond claim would have no value if the bonding company was unable to enforce the debtor general contractor's obligation on the payment bond. In most cases, the viability of an "indirect transfer" theory appears to hinge on this factor. In re J.A. Jones, Inc. 361 B.R. at 103; see also Askenaizer v. Seacoast Redimix Concrete, LLC (In re Charwill Constr., Inc.), 2007 Bankr. LEXIS 4379 (Bankr. D.N.H. Dec. 21, 2007).

In this case, Defendant's evidence consists of (1) the fourteen invoices whose payments are the subject of this preference action, and (2) Defendant's answers to the trustee's first set of written interrogatories, which contain Defendant's uncontradicted statements that the debtor received certain disbursements after the invoice dates. Defendant asserts that the bonding company could have asserted a lien on these disbursements. However, that the debtor received disbursements after

9

the invoice dates is insufficient. Instead, the debtor must have received these payments during a time in which the bond claim would have been filed. In this case, the relevant time period in which to look is 90 to 120 days after the invoice date because this is the time period during which Pennington testified that a bond claim would have been filed.

Based on the invoices submitted by Defendant, the court concludes that only two of the invoices meet this test. The first eligible invoice is Invoice Number 312, which was invoiced on March 22, 2004, in the amount of $500.00 for work performed on the University of South Carolina, Beaufort project. According to Defendant's evidence, the debtor received a subsequent disbursement from Brookwood Construction in the amount of $59,625.00 on July 13, 2004. Thus, this disbursement was made 113 days after the invoice date, and assuming that Defendant would have filed a timely bond claim and been paid in full, the bonding company could have asserted a lien on these funds. The second eligible invoice is Invoice Number 317, which was invoiced on March 26, 2004, in the amount of $2,000.00 for work performed on the Cape Fear Community College project. According to Defendant's evidence, the debtor received a subsequent disbursement from Lee F. Cowper, Inc. in the amount of $163,632.40 on June 28, 2004. Thus, this disbursement was made 94 days after the invoice date. Again assuming that Defendant would have filed a timely bond claim and been paid in full, the bonding company could have asserted a lien on these funds as well. In none of the other payments is there evidence that the debtor received money from the general contractor after the bond claim would have been filed.

## CONCLUSION

Based on the foregoing, Defendant has successfully established a new value defense with respect to $2,500.00 of the preferential payments. Therefore, the trustee is entitled to recover

$4,805.48 of the preferential payments for the benefit of the estate.  The clerk is directed to enter judgment accordingly.

**"END OF DOCUMENT"**